No. 25,318.

C. A. LEINBACH et al., *Appellants,* v. UNION PACIFIC RAILROAD COMPANY, *Appellee.*

SYLLABUS BY THE COURT.

1. DAMAGES—*Failure to Furnish Cars—Car Shortage—Rules for Redressing Unjust Car Discrimination—Competent Evidence.* In an action against a railroad company for damages for failure to furnish cars in which to ship grain, where the defendant had answered that it was prevented from furnishing the cars by unavoidable causes which it could not with the use of reasonable foresight and diligence have avoided, evidence was admissible to show that there was a car shortage and that cars were distributed under rules adopted while the railroads were under governmental control, under which rules the defendant continued to operate after the cessation of that control.

2. SAME—One who sells wheat to another and orders from a railroad company cars in which to ship the wheat after the sale cannot recover damages from the railroad company for failure to furnish cars in obedience to the rules of the railroad company for the distribution of cars during a car shortage, where the effect would be to give the purchaser an advantage in the distribution of cars for the shipment of wheat.

3. SAME—*Findings of Fact Sustained by Evidence—Conclusions of Law Properly Drawn.* Certain conclusions of law were properly drawn from certain findings of fact, all of which are set out in the opinion; and the findings of fact were sustained by evidence.

4. SAME—*Judgment.* The court did not err in rendering judgment in favor of the defendant and against the plaintiffs.

5. SAME—*Motion for New Trial.* The court did not err in overruling the motion for a new trial.

Appeal from Pottawatomie district court; ROBERT C. HEIZER, judge. Opinion filed July 5, 1924. Affirmed.

*W. F. Challis,* of Wamego, and *C. A. Leinbach,* of Onaga, for the appellants.
*T. M. Lillard, Bruce Hurd,* and *O. B. Eidson,* all of Topeka, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiffs commenced this action to recover damages caused by the failure of the defendant to furnish the plaintiffs cars in which to ship wheat. Judgment was rendered for the defendant, and the plaintiffs appeal.

The petition contained the following:

"Plaintiffs for their cause of action allege that during the month of July, 1920, they were the owners of 2,071 bushels of wheat, which they had in their possession on farms owned and operated by them, near Onaga, in Pottawatomie county, Kansas; that on or about the 9th day of July, 1920, these plaintiffs sold said wheat at the then market price of $2.60 per bushel, July delivery; that by the contract of sale these plaintiffs were to deliver said wheat in cars at Onaga; that in pursuance of said sale the plaintiff C. A. Leinbach, acting for himself and as agent for his coplaintiff S. E. Leinbach, ordered or requested of defendant's agent at Onaga a box car in which to ship said wheat, and then and there, at the direction of defendant's agent, signed a written request or order for such car; that said order or request for said car was made on the 15th day of July, 1920.

"Plaintiffs further allege that on or about the 18th day of July, 1920, the plaintiff C. A. Leinbach, acting for himself and as agent for his coplaintiff S. E. Leinbach, told defendant's agent at Onaga, Kan., that plaintiffs wanted another or second car for shipping wheat from Onaga, Kan., to Kansas City, Mo., to be ready for loading on the 22d day of July, 1920."

A jury was waived and trial was by the court. Special findings of fact were made as follows:

Leinbach v. Railroad Co.

"1. The plaintiffs were engaged in farming in the year 1920. They raised wheat, partly on their farm about a mile from Onaga, and partly on another farm two miles from Onaga, in Pottawatomie county, Kansas, their total crop for the year amounting to several thousands of bushels. They started threshing on July 18, 1920, and had about 1,000 or 1,200 bushels threshed on July 22, 1920.

"2. On July 15, 1920, plaintiff C. A. Leinbach signed a written order for one car in which to ship wheat from Onaga, Kan., to Kansas City, Mo., over defendant's railroad line, requesting that car be furnished on July 22. On or about July 18 plaintiff C. A. Leinbach had another conversation with the agent of the defendant at Onaga, in which a statement was made that Mr. Leinbach might want another car, but no additional order was signed or entered on defendant's records.

"3. At the commencement of the wheat season of 1920 and for a number of months thereafter a car shortage existed on the lines of the defendant company and also on all other roads in the middle west. This car shortage arose from unusually heavy traffic and was attributed largely to the fact that the box cars of the middle-western lines had during the operation of the railroads by the United States railroad administration largely accumulated at eastern terminals and had not been returned to the middle-western lines. On July 15, 1920, there were 22,085 Union Pacific box cars on other roads out of a little over 24,000 such cars owned by the defendant company. Plaintiffs were aware of this car shortage at the time they placed their order.

"4. The defendant railroad company was using all reasonable means to obtain a return of its cars to move its traffic rapidly and to relieve car shortage.

"5. The United States government, through the United States Railroad administration, and by its director general of railroads, took possession of the Union Pacific Railroad Company's lines on December 27, 1917, and continued to operate them until March 1, 1920. The United States Railroad administration car-service bureau continued the distribution of cars of railroad companies previously under federal control, by a pool arrangement, which continued during the six months' guarantee period following the termination of federal control on March 1, 1920.

"6. Throughout the year 1920 there was in effect on the lines of Union Pacific Railroad Company a set of rules regulating the distribution of cars between shippers during the periods of car shortage, of which the following is a copy:

" 'To Railroads:

" 'Effective September 16, 1919, the following rules will, during periods of car shortage, govern uniformly the distribution between shippers of cars available for grain loading at stations:

" '1. Each shipper of grain will advise the carrier's agent each Saturday of the total quantity of grain on hand tendered for rail shipment. The ratio of the quantity so reported by each shipper to the total quantity reported by all shippers shall be the percentage basis for the distribution of available cars at that station during the ensuing week for grain loading.

32—116 Kan.

" '2. Each shipper of grain shall make written order on the carrier's agent for cars wanted for grain loading, showing the following information:

" 'A. Date of order.

" 'B. Number of cars wanted (in units of 40-ton cars) and whether for sacked or bulk grain.

" 'C. Destination.

" 'D. Date wanted to load.

" 'E. Quantity of each kind of grain on hand and conveniently located for prompt loading tendered for rail shipment.

" 'F. Name of shipper.

" 'Copies of orders by a shipper located on more than one carrier (steam, electric or water) shall be filed with the agent of each carrier. Such combined orders must not exceed the total grain conveniently located for prompt loading tendered for shipment.

" '3. Cars will not be furnished in excess of a shipper's ability to load and ship promptly.

" '4. When a shipper's *pro rata* share of the available car supply is a fraction of a car, the fraction will be carried to his credit, and he will be entitled to car supply on the basis of the aggregate of such fractional credits.

" '5. The term "prompt loading" as used in these rules is intended to mean that a car placed for loading not later than 10 a. m. must be loaded and billing instructions tendered before the close of the day on which it is placed, failing which, such car will be charged against the shipper's allotment as an additional empty for each succeeding day held for loading or for billing instructions.　　　" 'W. C. KENDALL, *Manager Car Service Section.*'

"The court finds that the rules for car distribution above set out were reasonable under the car-shortage conditions existing on the defendant's line in 1920. No application had been made at any time to the interstate commerce commission to have the rules for car distribution above referred to set aside or amended on the ground that they were unfair or unreasonable.

"7. The defendant in distributing its cars among shippers during the month of July, 1920, and the following months made distribution in accordance with the rules set out in the previous finding.

"8. Prior to the plaintiffs placing their order for the car on July 15, 1920, written orders for cars for shipments of grain had been placed with the defendant's agent at Onaga, Kan., by elevators which had grain available to load and ship promptly, the grain being in elevators either located on defendant's sidetrack at Onaga or within a block thereof. The orders placed by those elevators were sufficient in number to take up all cars which the defendant had available for loading at Onaga during the period complained of in plaintiff's petition.

"9. Plaintiff's wheat was not available for "prompt loading" as that term was defined in the rules in force on defendant's railroad; that is, the plaintiff's wheat was more than a mile from the railroad station, and the evidence does not show that a car, if placed for loading in response to plaintiff's order, not later than ten o'clock, could have been loaded with wheat from plaintiff's farm before the close of the day on which the car was placed.

"10. At the time plaintiffs ordered a car from the defendant in July they had an agreement with Peter Gaume & Son, of Onaga, Kan., that they would buy one carload of grain from the plaintiffs, to be delivered on board of car at Onaga in July, at a price of $2.60 per bushel; 1,700 to 1,800 bushels is considered a carload.

"11. In September, 1920, plaintiffs sold ·425 bushels of wheat at $2.29 per bushel. On December 6, 1920, they sold 1,640 bushels of wheat at $1.50 per bushel, both of said sales being made at the market price prevailing at Onaga on the date of sale. On August 2, 1920, the market price for hard wheat at Kansas City, Mo., ranged from $2.20 to $2.32; on July 15, at Kansas City; from $2.84 to $2.92. Onaga prices were about 15 cents lower .than the Kansas City prices quoted above.

"On September 20, 1920, hard wheat had a market value at, Onaga ,of $2.28 per bushel. On December 6, 1920, it had a value at Onaga of $1.62 per bushel. February 16, 1921, it had a market value of $1.55 per bushel at Onaga.. Leinbach wheat was No. 1 hard.

"12. Plaintiffs called at the railroad station of defendant a number· of times between July 15 and July 31, 1920, asking for the car they had ordered, and stated that they had sold their wheat conditional upon being able to load it in a car during the month of July. They were told that the few cars that were available were being distributed on earlier orders, and that the defendant was endeavoring to distribute during car shortage in accordance with present rules. Plaintiffs did not reorder the car or· make any inquiry ·about cars after the first of August, 1920."

1. It is claimed that there was error in admitting evidence to prove an issue not raised by the answer. The answer alleged that—

"If it [the defendant] failed at any time ·to furnish cars to the plaintiffs, or to any other person, at any time promptly, it was prevented from doing so by accidental or unavoidable causes which could not by the use of reasonable foresight and diligence have been avoided."

The evidence complained of was that which tended to show that there was a car shortage, and that the defendant was distributing grain cars in obedience to rules promulgated by the car-service commission while the railroads were under governmental operation. That operation of railroads had ceased when the plaintiffs ordered the cars which has become the subject of this controversy; but the defendant, during the shortage of cars, continued to operate under those rules. The cars were intended for use in interstate commerce. The liability, if any, was under federal laws. (*Chi., R. I. &c. Ry. v. Hardwick Elevator Co.*, 226 U. S. 426.) The rule observed by the defendant was good and binding until the interstate commerce commission declared it unreasonable. (*Penna. R. R. v. Clark Coal Co.*, 238 U. S. 456; *Director General v. Viscose Co.*, 254 U. S. 498.) The evidence tended to prove that the defendant was prevented from furnishing cars by unavoidable causes which it could not by the use· of reasonable foresight and diligence have prevented.

2. The plaintiffs contend that under the rules for the distribution of cars observed by the defendant they were entitled to the cars when

compared with the number of cars furnished to other shippers of grain at Onaga. The plaintiffs had sold their wheat. The purchasers had imposed the condition that the wheat should be loaded on the cars. To comply with that condition, the plaintiffs orderd the cars. If the plan had proved successful it would have resulted in the purchasers securing more than their share of the cars available under the rules for the distribution of cars at Onaga. That may have been the reason for imposing the condition. The purchasers by that condition could not lawfully get more than their share of available cars. The plaintiffs could not lawfully assist the purchasers in getting more than their share of such cars, and they cannot collect damages from the defendant for failure to furnish cars under such circumstances.

3. The plaintiffs argue that "the court erred in its conclusions of law that the defendant was not liable in damages to the plaintiffs, because such conclusions were contrary to and unsupported by the findings of fact and also by the evidence in the case." The conclusions of law were not contrary to the findings of fact. The conclusions of law were properly drawn from those findings which were sustained by evidence.

4. Another contention of the plaintiffs is that "the court erred in rendering judgment in favor of the defendant and against the plaintiffs for the costs, and denying the prayer of plaintiffs' petition." The argument to sustain this contention is a repetition of the argument to sustain those that have been disposed of, and does not need further discussion. The contention is not good.

5. Still another contention is that "the court erred in overruling and denying plaintiffs' motion for a new trial for the grounds therein set out." This falls with the other contentions of the plaintiffs. This contention would be correct if the others were good. Since they are not good, this necessarily falls with them.

The judgment is affirmed.